ATTORNEY FOR HON. GRANT W. HAWKINS, JUDGE
Kevin P. McGoff
Indianapolis, Indiana

ATTORNEYS FOR HON. NANCY BROYLES,
COMMISSIONER
James H. Voyles
Jennifer M. Lukemeyer
Indianapolis, Indiana

ATTORNEY FOR THE COMMISSION ON
JUDICIAL QUALIFICATIONS
Adrienne L. Meiring
Brenda F. Rodeheffer
Indianapolis, Indiana



FILED
Mar 11 2009, 4:19 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 49S00-0804-JD-157

IN THE MATTER OF:

THE HONORABLE GRANT W. HAWKINS,
JUDGE IN THE MARION SUPERIOR COURT

and

THE HONORABLE NANCY BROYLES,
COMMISSIONER IN THE MARION SUPERIOR COURT

JUDICIAL DISCIPLINARY ACTION

Hon. Marianne L. Vorhees,
Hon. Clarence D. Murray, and
Hon. Terry C. Shewmaker,
Special Masters

**March 11, 2009**

**Per Curiam.**

This matter comes before the Court as a result of judicial disciplinary actions initiated on April 9, 2008, by the Indiana Commission on Judicial Qualifications ("Commission") against

Grant W. Hawkins, Judge in the Marion Superior Court, Criminal Division 5 ("Court 5") and against Nancy Broyles, a Commissioner serving in Court 5. These actions were consolidated on June 18, 2008. Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25 give the Indiana Supreme Court original jurisdiction over this matter.

Judge Hawkins and Commissioner Broyles are charged with various violations of the Code of Judicial Conduct arising out of excessive delays in issuing rulings on prisoners' petitions for post-conviction relief, which in one case resulted in a prisoner's incarceration being unnecessarily prolonged by nearly two years, and other issues that arose during the Commission's investigation of these delays.

On October 10, 2008, the Court entered an order approving a "Statement of Circumstances and Conditional Agreement for Discipline" tendered by Commissioner Broyles and the Commission. Under this agreement, Commissioner Broyles admitted judicial misconduct and has been permanently banned from serving in any judicial capacity of any kind.

On October 30, 2008, the Special Masters appointed in this case filed their "Masters' Findings of Fact, Conclusions of Law, and Recommendations to the Indiana Supreme Court" with respect to Judge Hawkins. The matter has been fully briefed, and the Court now concludes that Judge Grant Hawkins has committed judicial misconduct. Three members of this Court agree that Judge Hawkins accordingly should be suspended from office without pay for at least sixty (60) days.

## Part I

At all times pertinent to the charges, Grant Hawkins served as the judge of, and Nancy Broyles served as a part-time master commissioner in, Court 5.[1] From January 2001 through February 2007, Commissioner Broyles was the judicial officer who primarily reviewed and presided over Court 5's post-conviction relief ("PCR") cases.

---

[1] The Marion Superior Court may appoint master commissioners to assist with various judicial duties. *See* Ind. Code §§ 33-33-49-16(e); 33-23-5-5 through -9.

2

Problems with Court 5's handling of PCR cases were first brought to light in January 2007, when Harold D. Buntin ("Buntin") filed a complaint with the Commission alleging that his PCR case before Commissioner Broyles had been pending for nearly 22 months. Additional problems were discovered during the Commission's investigation of the Buntin matter.

The Commission has the burden of proving judicial misconduct by clear and convincing evidence. *See* Ind. Admission and Discipline Rule 25(VIII)(K)(6); Matter of Drury, 602 N.E.2d 1000, 1002 (Ind. 1992). The Special Masters' recommended findings of fact and conclusions of law are not binding upon this Court. *See* Admis. Disc. R. 25(VIII)(N)(1) and 25(VIII)(P)(3). Our standard of review of the Masters' report is *de novo*. *See* Drury, 602 N.E.2d at 1002. After reviewing the evidence and the Special Masters' findings, we find that the Special Masters have carefully and thoroughly analyzed the evidence presented in this case and, therefore, we accept their findings of facts except to the extent explained below.

*Harold D. Buntin's post-conviction relief case.*

Buntin was convicted of a robbery and rape that occurred in Indianapolis on August 4, 1984. The victim, who was working at a dry cleaning business, testified that a man came in around closing time and asked for an order under a name she understood to be "Button." When she could find no order under that name, he asked for an order under the name of "Evans" or "Harris." When the victim's back was turned, the man put scissors to her throat, took money from the store's register and from the victim, and had intercourse with the victim, still with the scissors at her neck. The victim was not sure whether the man ejaculated. Seminal fluid collected from a vaginal swab of the victim was tested using the technology of the mid-1980s. It was determined that the person who contributed the semen was a "secretor"[2] with type O, Rh positive blood.

---

[2] A secretor is one whose blood type may be determined by examination of other bodily fluids because the antigens in the blood "leak" into those other fluids. *See* Ben-Yisrayl v. State, 738 N.E.2d 253, 264 n.9 (Ind. 2000).

The victim saw Buntin several months after the attack in a supermarket and identified him as her attacker. Buntin was arrested and charged with rape and robbery. At his trial, evidence was admitted that Buntin was a secretor and could have contributed the seminal fluid. Buntin asserted an alibi defense, but when he learned the State had evidence that he was in Indianapolis at the time of the attack, he fled to Florida. He was convicted of rape and robbery in absentia in 1986 and sentenced to 50 years incarceration.

While in Florida, Buntin lived under the name of "David Evans" (Evans being the last name of a grandmother and uncle) and was convicted of seven armed robberies. Buntin was eventually extradited from Florida and began serving his Indiana sentence in 1994. In 1998, Buntin filed a Petition for Post-Conviction Relief in Court 5 based upon DNA evidence not available during his trial and upon ineffective assistance of trial counsel. Commissioner Broyles presided over Buntin's post-conviction hearing on March 16, 2005.[3] The new DNA evidence established that Buntin was not the contributor of the seminal fluid collected from the victim after the crime. By April 18, 2005, Buntin's attorney, Carolyn Rader ("Rader"), and the State each submitted proposed Findings of Fact and Conclusions of Law, with proposed Orders, to Commissioner Broyles, and she took it under advisement.

Approximately four months later, in August 2005, Commissioner Broyles told Rader she intended to work on the Buntin case and asked Rader for a diskette containing Rader's proposed findings, which Rader's staff promptly delivered to Court 5. On August 11, 2005, Buntin wrote a letter to Court 5 inquiring about his case. Records from the Marion County Clerk's Office indicate that someone from Court 5 requested the Buntin file on August 25, 2005. Rader sent an email to Commissioner Broyles at the end of September 2005 inquiring about the status of case. On September 30, 2005, Buntin sent another letter of inquiry to the court.

Records from the Marion County Clerk's Office indicate that someone from Court 5 requested the Buntin file again on October 25, 2005. The Clerk's records indicate the file was not found in that office's possession. On November 11, 2005, January 13, 2006, and April 20,

---

[3] There is no allegation that the delay between the filing of the petition and the hearing was the fault of Commissioner Broyles or Judge Hawkins.

4

2006, Buntin wrote three more letters to Court 5 inquiring about his case. Rader sent an email to Commissioner Broyles at on April 20, 2006 inquiring about the status of case. In addition, Buntin's family made numerous calls to Court 5 asking about the case. None of the inquiries about the status of the case were answered.

The evidence indicates that Commissioner Broyles signed an order granting Buntin post-conviction relief on May 20, 2006. Commissioner Broyles testified that she agonized over her decision to grant PCR to Buntin. She believed the evidence strongly supported the jury's finding of guilt and the new DNA evidence did not exonerate Buntin because the victim testified that her attacker may not have ejaculated. Nevertheless, Commissioner Broyles concluded the new DNA evidence casted sufficient doubt on the reliability of the original jury verdict that Buntin deserved a new trial.

Although Commissioner Broyles signed the order in 2006, she inadvertently retained the typewritten year "2005" from the proposed order Buntin's attorney had provided in 2005. She attached a post-it note to the order with instructions for processing it. The post-it note included reference to an incomplete date, namely "05-20-0". The order was not processed at that time by the Court 5 staff and/or the deputy clerk assigned to Court 5.

On January 8, 2007, Buntin filed a complaint with the Commission against Commissioner Broyles concerning the lengthy delay in any ruling in his case. The Commission's counsel, Meg Babcock, contacted Judge Hawkins during the first week of March 2007 to inquire about the matter. Judge Hawkins reported that the Buntin file could not be located but that court staff was looking for it. He told Ms. Babcock he would report back to her.

Thereafter, staff members of the Marion County Clerk's Office conducted an extensive search and could not locate the Buntin file in the Clerk's office. Then, without explanation, the Buntin file appeared mysteriously on a desk in Court 5's offices on or about March 6, 2007. No staff member assigned to Court 5 in March 2007 has admitted being the person who found the Buntin file or the person who first received the file from the person who located it. On the evidence presented, the Masters opined that the most likely scenario is that the staff member to

5

whom Commissioner Broyles gave the signed order with directions to process it forgot to do this, put the file aside, and forgot the file until Ms. Babcock's call about ten months later. Then to cover up the mistake, the staffer put the file on the desk where it made its mysterious appearance.

When Judge Hawkins opened the Buntin file after it was located, he found an order granting Buntin's petition for post-conviction relief, which was signed by Commissioner Broyles and dated May 20, 2005, along with the attached post-it note and the a diskette containing the order. Judge Hawkins noted the signed order in the file contained some odd typographical errors apparently caused by the electronic transfer of the original document. [4] Therefore, he inserted the diskette into his computer, corrected some of the errors, and reprinted the order, retaining the original signature page dated May 20, 2005. On March 8, 2007, the court issued the order granting Buntin's petition for post-conviction relief ("Buntin PCR Order"), which was dated May 20, 2005, but made it effective March 8, 2007.[5] Judge Hawkins then gave control over the Buntin file to that Court 5's deputy bailiff, Stephen Talley ("Talley"). Neither the replaced pages of the original order nor the diskette can now be located, although the post-it note found on the original order remained in the file attached to something else.

In addition to issuing the Buntin PCR Order on March 8, 2007, Judge Hawkins and Commissioner Broyles issued a "Notice Explaining Delayed Ruling on Petition for Post-Conviction Relief" ("Notice") in which they reported, among other things, that Commissioner Broyles had signed an order granting PCR relief on "May 20, 2005," that the Buntin file had been "archived" without the order being processed, and that the file had been "retrieved from archives." Although the Judge and Commissioner believed these statements at the time, they proved later to be inaccurate.

---

[4] Judging from errors remaining in the revised order, it appears the errors in the unprocessed order were primarily the replacement of quotation marks with other characters or symbols.

[5] At this point, Judge Hawkins and Commissioner Broyles believed that Commissioner Broyles had signed the original order on May 20, 2005. It was only upon later reflection and a review of her personal records that Commissioner Broyles concluded she actually may have signed the order on May 20, 2006.

Although Judge Hawkins told the Commission's counsel in early March that he would report back to her, he did not do so until the Commission's counsel sent him a follow-up email on March 21, 2007. In his email response to the Commission on that date, Judge Hawkins referred the Commission to the inaccurate March 8, 2007 Notice for an explanation of what had happened in the Buntin matter. In addition, Judge Hawkins told Ms. Babcock:

> In the normal course, when someone is waiting for a ruling, they call or write the court. The attorneys didn't write or call. Petitioner may have called, but he certainly didn't write. Any letter he might have sent would go into the file after being examined by one of the judicial officers in this court.

As noted previously, however, both Buntin and his attorney had in fact contacted Court 5 in writing on several occasions and all inquiries were unheeded. The five letters from Buntin to the court written before March 2007 (save for one loose page with a post-it note reading "Letter was found loose in back of [the Buntin] file") could not be located in the Buntin file, in Court 5's "Can't Find File" file,[6] or elsewhere, although the CCS for the case documents their receipt.

On May 23, 2007, Judge Hawkins sent a letter to the Commission along with copies of the Buntin PCR Order and the post-it note that had been on the unprocessed order. As mentioned previously, the post-it note had an incomplete date of "5-20-0." Bailiff Talley made the copy of the post-it note Judge Hawkins sent to the Commission. Talley wrote on the copy: "5/20/05 Judge, printed out a copy of the Postit [sic] note, but the date didn't print well so I rewrote down and initialed it." Talley made this notation without checking with Commissioner Broyles. Talley's statement that there was a problem with copying the date was simply false. Relying on Talley's note, Judge Hawkins repeated this erroneous information in his letter to the Commission.

After the Buntin PCR Order was issued on March 8, 2007, Judge Hawkins gave it to bailiff Talley, who prepared a "minute sheet" so the order could be entered on the Chronological Case Summary ("CCS") for the case. Judge Hawkins testified he thought the order was "taken care of" at that point, but for some reason Judge Hawkins could not explain, no one entered the

---

[6] The "Can't Find File" file was a file in which Court 5 staff put documents for which they could not locate the file. The staff would decide whether a judicial officer needed to see the material right away. If they decided it was not that important, they would put the materials in the "Can't Find File" file. Some materials stayed in this file for months, even years.

order on the CCS until March 27, 2007—a delay of nearly three weeks. The deputy clerk at the time testified she would input minute entries within a day, sometimes two, after she received them from a court, which suggests the hold-up was in Court 5 and not in the Clerk's office.

Further, Indiana Post-Conviction Rule 1, Section 6, requires a court, after granting post-conviction relief, to enter "any supplementary orders as to arraignment, retrial, custody, bail, discharge, correction of sentence, or other matters that may be necessary and proper." Judge Hawkins agreed that after the Buntin PCR Order was issued on March 8, 2007, Buntin returned to the legal status of not guilty, and the court should have ordered him returned to the Marion County Jail and set a bond. No action in this regard, however, was taken. It was only after members of Buntin's family called Court 5 inquiring about the case that Judge Hawkins scheduled a hearing for April 20, 2007.[7] At the hearing, the State elected not to retry Buntin on charges based on events nearly 23 years in the past. Buntin was therefore released on April 20, 2007.

In the course of the Commission's investigation into the whereabouts of the Buntin file, Talley sent an email on June 7, 2007, to Ms. Babcock stating, "I called down to [the Clerk's office's archives] and they located the file, but I can't recall if it was me or Master Commissioner Broyles that went and physically got the file." On August 2, 2007, Talley told the Commission that Commissioner Broyles went down to archives and retrieved the file. He said he remembered Commissioner Broyles with the Buntin file in her hand in March 2007, and then she went into Judge Hawkins' chambers. On August 23, 2007, Talley told the Commission that he did not call archives to request the file, he assumed it was in archives because it was not anywhere in the office, and he was "just shocked" that the file was found. He said he had earlier assumed Commissioner Broyles had retrieved the Buntin file from archives because he recalled seeing her with the file in a hallway near an elevator that goes down to old records. When pressed, he stated he had just assumed the "fat file" she was holding was the Buntin file.

---

[7] On April 12, 2007, the court also received a letter from Buntin asking for his release. It is unclear from the record whether Judge Hawkins was aware of Buntin's letter before he ordered the April 20, 2007 hearing.

The Commission sent Talley's statements to Judge Hawkins on September 28, 2007, which should have alerted Judge Hawkins that the prior representations in his March 8, 2007 "Notice" about the file having been "archived" and "retrieved from archives" were based on incorrect information. Judge Hawkins, however, did not conduct any further investigation on his own as to where the Buntin file had been and how it was located.

The Masters accepted, as does the Court, Judge Hawkins' and Commissioner Broyles' testimony that they personally did not do anything to disturb the Buntin file or to remove items from it after it was located. The Masters found it probable that a staff member who had control of the file may have decided to "cleanse" the file, perhaps removing matters that he or she deemed incriminating. Regardless of how the items were lost, the fact that Judge Hawkins did not immediately report the file's discovery and his actions to the Commission opened the opportunity for an unidentified person to remove or lose items of relevance to the Commission's investigation.

*Delay in entering orders in other post-conviction-relief cases.*

In addition to issues related to the delayed ruling in the Buntin case, the Commission's investigation uncovered delayed rulings in several other PCR cases in Court 5 over which Commissioner Broyles presided:

- Edwards v. State, Cause No. 49G05-9604-PC-061303, thirteen-month delay.

- Bewley v. State, Cause No. 49G05-9804-PC-064052, thirteen-month delay.

- Johnson v. State, Cause No. 49G05-0302-PC-021874, six-month delay.

- Bailey v. State, Cause Nos. 49G05-0212-PC-311072, 49G05-0212-PC-306918, 49G05-0301-PC-003842, thirteen-month delay.

- Dunlap v. State, Cause No. 49G05-9801-PC-012097, fifteen-month delay. The evidence shows this file was lost for a time.

- Brown v. State, Cause No. 49G02-9510-PC-149022, twenty-eight-month delay. In a separate "notice," Judge Hawkins and Commissioner Broyles stated that an order was signed on February 17, 2005, but not processed until March 21, 2007, because the case had been mistakenly closed and archived before the order was processed.

9

- <u>Stephens v. State</u>, Cause No. 49G05-9805-PC-076033, nine-month delay. A note in the file by Commissioner Broyles states: "[S]how file lost causing delay in ruling." She issued the ruling without the file ever having been found.

*Commissioner Broyles' issuance of final orders without proper authority.*

The Commission's investigation also uncovered the fact that Judge Hawkins was regularly permitting Commissioner Broyles to enter final orders in PCR cases, instead of reporting her findings to him for his own review and entry of the final order.

The authority of Commissioner Broyles in the post-conviction matters at issue in this case is governed by Indiana Code § 33-33-49-16(e), which provides: "A master commissioner shall report the findings in each of the matters before the master commissioner in writing to the judge or judges of the division to which the master commissioner is assigned or as designated by rules of the court." Except in circumstances inapplicable to this case, a master commissioner "may not enter a final appealable order" but "shall report findings in an evidentiary hearing, a trial, or a jury's verdict to the court. The court shall enter the final order." Ind. Code §§ 33-23-5-8(2) and -9(a). In contrast to post-conviction matters, however, we note that Indiana Code § 33-23-5-9 permits a master commissioner who presides at a criminal trial to enter a final order.[8]

*The Commission's charges against Judge Hawkins and Commissioner Broyles.*

Based on the above-recited facts, the Commission alleged both the Judge and the Commissioner violated the following provisions of the Indiana Code of Judicial Conduct[9] and Admission and Discipline Rules:

---

[8] These statutory sections pertain to magistrates. Indiana Code section 33-33-49-16(e) gives a master commissioner the powers and duties prescribed for a magistrate.

[9] The following were in effect at the time of the alleged misconduct. The Code of Judicial Conduct was revised effective January 1, 2009.

- Canon 1: "A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards in order to preserve the integrity and independence of the judiciary."

- Canon 2A: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

- Canon 3B(2): "A judge shall be faithful to the law . . . ."

- Canon 3B(9): "A judge shall dispose of all judicial matters fairly, promptly, and efficiently."

- Admission and Discipline Rule 25(III)(A)(6): "Any judicial officer may be disciplined for . . . conduct prejudicial to the administration of justice . . . ."

The Commission also alleged Judge Hawkins violated the following additional Canons of Judicial Conduct:

- Canon 3C(3): "A judge with supervisory authority for the judicial performance of other judges shall take reasonable measures to assure the prompt disposition of matters before them and the proper performance of their other judicial responsibilities."

- Canon 3C(2): "A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge . . . ."

Our review of the facts of this matter demonstrates that Commissioner Broyles was primarily responsible for the inexcusable delay in the Buntin case and the other PCR cases discussed above. The resulting harm to Buntin was continued incarceration while awaiting a ruling granting his petition for post-conviction relief, which ultimately resulted in his release.

Canon 3B(9) requires judges to dispose of all matters promptly and efficiently. It is essential for all judicial officers to have in place procedures to ensure not only that the judge makes a timely decision, but also that the order is correctly and promptly processed by the personnel responsible for the task. Lack of such procedures in Court 5 allowed the order Commissioner Broyles signed in the Buntin case in May 2006 to go unprocessed until the Commission initiated an investigation ten months later, allowed the Buntin file to disappear

11

during this ten-month period, allowed Buntin's letters to Court 5 to go unheeded, and allowed the Buntin PCR Order issued on March 8, 2007, to go unprocessed for nearly three weeks.

In addition to Buntin's letters, there were of other contacts with Court 5 that should have prompted a ruling—numerous telephone calls from Buntin's family, at least two emails from Rader, and several inquiries from Rader's paralegal. Commissioner Broyles and Judge Hawkins both asserted that they would have welcomed some prompting to make a ruling. The statement by Judge Hawkins that no such inquiries were made, when in fact many were indeed made, clearly demonstrates Court 5 lacked a system that ensured that either the Commissioner or the Judge was advised of inquiries about overdue rulings. Moreover, the inquiries Commissioner Broyles actually received went unheeded.

Further, as noted above, Commissioner Broyles routinely entered final orders in PCR cases, rather than reporting her findings to Judge Hawkins for entry of the final order, in violation of Indiana Code sections 33-33-49-16(e), 33-23-5-8(2) and 33-23-5-9(a). Commissioner Broyles gave the impression that entering the orders without the judge's approval was nothing more than a technicality.

Commissioner Broyles was widely respected by the criminal defense bar for her competence in PCR issues and was known as a commissioner who would give a defendant a fair hearing. Prior to her service as a commissioner for Judge Hawkins, she worked for over six years as commissioner for another judge of the Marion Superior Court. Notwithstanding her commendable service, however, Commissioner Broyles admits, and we agree, that she violated Canons 1, 2A, 3B(2), and 3B(9) of the Code of Judicial Conduct, and that she committed conduct prejudicial to the administration of justice. Pursuant to her agreement with the Commission, which we approved on October 10, 2008, she has been permanently banned from serving in any judicial capacity of any kind, including service as a judge pro tempore.

The Commission alleged eleven counts of judicial misconduct against Judge Hawkins. These fall into three categories: (1) conduct before the Commission's inquiry into the alleged

delay in the Buntin ruling; (2) conduct during the Commission's investigation; and (3) delay in the Buntin case after the order granting his PCR petition was issued.

*The charges against Judge Hawkins relating to conduct before the Commission's inquiry*.

The Commission alleged the following counts of misconduct relating to this period:

- Count I:   Judge Hawkins permitted delays in PCR cases, violating Canon 3C(3) and committing conduct prejudicial to the administration of justice.

- Count II:   Judge Hawkins permitted Commissioner Broyles to issue purportedly final orders, violating Canon 3B(2) and committing conduct prejudicial to the administration of justice.

- Count III:   Judge Hawkins permitted an environment in which the Buntin file was lost, violating Canons 2A and 3C(2), and committing conduct prejudicial to the administration of justice.

- Count IV:   Judge Hawkins permitted an environment in which Buntin's letters to the Court were lost, violating Canons 2A and 3C(2), and committing conduct prejudicial to the administration of justice.

When Judge Hawkins took over Court 5, he inherited and continued the unlawful practice of permitting a commissioner to enter final PCR orders.  Although both he and Commissioner Broyles participated in this improper procedure, it was ultimately Judge Hawkins' responsibility to ensure that Court 5 operated in compliance with the law.  Review of final orders by the presiding judge is not a mere technicality.  If Judge Hawkins had complied with these statutory provisions, he could have discovered and addressed the delays in Commissioner Broyles' rulings.  As a judge with supervisory authority over Commissioner Broyles, Judge Hawkins violated his duty to take reasonable measures to assure the prompt disposition of matters before judicial officers he supervised and thus bears ultimate responsibility for Commissioner Broyles' delays.

The Masters found that Judge Hawkins had little to no organization regarding PCR case files (and other case files) in his office.  The PCR case files were maintained from time to time at Commissioner Broyles' home, in her office, in a closet that Court 15 lent to Court 5 for storage,

on one of several file shelves in the office, or under Talley's desk (where it was kept after its discovery on March 6, 2007). Judge Hawkins was never able to explain what happened to the letters Buntin sent to Court 5. The Masters found it likely they ended up in Court 5's "Can't Find File" file, from whence they apparently thereafter disappeared. Whether or not that is what happened to the letters, the fact that Court 5 maintained such a file in the first place, in which items might remain for months or even years, should have alerted Judge Hawkins to a serious problem in need of immediate attention. As the presiding judge in Court 5, Judge Hawkins bore ultimate responsibility for failing to institute a system that ensured files under his control could be located and documents would not be lost.

The Court agrees with the Masters' conclusion that the Commission proved the allegations in Counts I through IV by clear and convincing evidence and that Judge Hawkins' conduct violated Canons 2A, 3B(9), 3B(2), 3C(2), and 3C(3), of the Code of Judicial Conduct and constituted conduct prejudicial to the administration of justice.

*The charges against Judge Hawkins relating to conduct during the Commission's investigation.*

The Commission alleged the following counts of misconduct relating to its investigation:

- Count V: Judge Hawkins failed to notify the Commission during its early investigation that the Buntin file had been located and an order had been issued, committing conduct prejudicial to the administration of justice.

- Count VI: Judge Hawkins misrepresented that the Buntin file had been archived, violating Canons 1 and 2A, and committing conduct prejudicial to the administration of justice.

- Count VII: Judge Hawkins failed to secure on March 8, 2007, the evidence that an earlier order in the Buntin case had been prepared, violating Canons 1 and 2A, and committing conduct prejudicial to the administration of justice.

- Count VIII: Judge Hawkins conveyed a false impression to the Commission that the post-it note contained evidence of a May 20, 2005 order having been prepared, violating Canons 1 and 2A, and committing conduct prejudicial to the administration of justice.

- Count XI: Judge Hawkins did not address bailiff Talley's misconduct during the Commission's investigation, violating Canons 1, 2A, and 3C(2), and committing conduct prejudicial to the administration of justice.

14

Judge Hawkins does not dispute that when he talked with Ms. Babcock in the first week in March 2007, he indicated he would look into allegations of delay in Buntin's PCR case and get back with her. He did not respond until prompted by an email from Ms. Babcock on March 21, 2007. In the meantime, he had located the Buntin file, discovered the unprocessed order and the diskette, used the diskette to modify the order and issue it, issued a "Notice" purporting to explain the delay, and turned the file over to bailiff Talley, under whose supervision the diskette and replaced pages from the unprocessed order were lost.

When he finally reported back to the Commission, Judge Hawkins misrepresented that the delay in issuing the Buntin PCR Order had been caused by the file inadvertently being "archived" in the Clerk's Office without the PCR Order being processed and filed, and that a post-it note indicated Commissioner Broyles had signed an order granting Buntin's petition on May 20, 2005. Although Judge Hawkins believed the information he gave the Commission was true, he apparently did little to verify its accuracy or investigate matters after he became aware that his statement was in fact inaccurate. Judge Hawkins did not inform the Commission until June 28, 2007, that he had altered the unprocessed order he found in the file. Judge Hawkins' delay in reporting to the Commission and the incomplete and inaccurate information he then gave the Commission complicated its investigation and compromised its ability to determine exactly what had happened in the Buntin case.

The Masters found that the Commission proved the allegations in Counts V through VIII by clear and convincing evidence. The Court agrees that Judge Hawkins' failure to report to the Commission as soon as possible when the Buntin file had been located and an order had been issued (Count V) constituted conduct prejudicial to the administration of justice.

However, with respect to Counts VI (misrepresentation about archiving the file) and VIII (misrepresentation about the post-it note), the evidence shows Judge Hawkins made these initial misrepresentations in good-faith reliance on information provided by Talley. And with respect to Count VII (failure to secure evidence of the unprocessed order), there is no evidence that Judge Hawkins had reason to know when he entrusted the Buntin file to Talley that pages from

15

the unprocessed order and the diskette would disappear on Talley's watch.  The Court therefore concludes that the Commission failed to prove the charges of Counts VI through VIII by clear and convincing evidence.

Talley's misrepresentations about the search for the Buntin file and the date on the post-it note, and his changing accounts regarding the former, appear to be major factors that complicated the Commission's investigation.  Still, the Masters concluded, and the Court agrees, that the Commission has failed to carry its burden of proving by clear and convincing evidence the charge in Count XI that Judge Hawkins committed misconduct by failing to address Talley's misconduct during the Commission's investigation.  The Masters cited evidence that Judge Hawkins confronted Talley about his conduct, made sure Talley knew it could not happen again, impressed on him the importance of telling the truth, and received an assurance that Talley understood.

*Charges relating to conduct of Judge Hawkins after Buntin's PCR petition was granted.*

The Commission alleged the following counts of misconduct relating to the delay in the Buntin case after the order granting post-conviction relief was issued:

- Count IX:  Judge Hawkins did not ensure on March 8, 2007, that the Buntin PCR Order was processed immediately and the parties were notified of the court's Order, violating Canons 1, 2A, and 3B(9), and committing conduct prejudicial to the administration of justice.

- Count X:  Judge Hawkins did not ensure that a hearing on the issue of Buntin's release or continued incarceration was immediately scheduled after March 8, 2007, violating Canons 1, 2A, and 3B(9), and committing conduct prejudicial to the administration of justice.

After the Buntin PCR Order was finally issued 22 months after the hearing, neither Judge Hawkins nor Commissioner Broyles supervised the processing of the order, nor did they verify with Court 5 staff or the deputy clerk assigned to Court 5 that the order had been processed promptly and entered on the CCS.  The Buntin PCR Order was not entered onto the CCS until

16

March 27, 2007—a delay of nearly three weeks, creating confusion about when the State's time for appeal would expire.

Further, after the issuance of the Buntin PCR Order, neither Judge Hawkins nor Commissioner Broyles complied with the requirement of Indiana Post-Conviction Rule 1, Section 6, that a court, after granting post-conviction relief, enter "any supplementary orders as to arraignment, retrial, custody, bail, discharge, correction of sentence, or other matters that may be necessary and proper." No hearing was set until after Buntin's family made inquires to the court. Judge Hawkins' delay in setting a hearing further prolonged Buntin's custody in the Department of Correction.

The Masters found that the Commission proved the charges in Counts IX and X by clear and convincing evidence. The Court agrees and concludes that Judge Hawkins' conduct violated Canons 1, 2A, and 3B(9) of the Code of Judicial Conduct and constituted conduct prejudicial to the administration of justice.

*Remedial efforts taken by Judge Hawkins and mitigating circumstances*.

Judge Hawkins has apologized for his actions, expressed his regret and remorse, and stated he has learned from his mistakes. In addition, since the Buntin case he has implemented new procedures whereby he signs off on all PCR orders. He has also taken measures to organize the files in his office and to mark pending PCR files in an effort to assure that the problems uncovered in this case never happen again.

Judge Hawkins has an outstanding reputation among attorneys and judges in Marion County for fairness, honesty, and integrity. Many strong character witnesses either testified for Judge Hawkins or submitted letters on his behalf. Judge Hawkins has also demonstrated a strong commitment of service to the courts and to his community, including service as a public defender.

17

**Part II**

Pursuant to her agreement with the Commission, which this Court approved by order of October 10, 2008, Commissioner Broyles is permanently banned from serving in any judicial capacity of any kind, including service as a judge pro tempore.

As to Judge Hawkins, the Masters found that his "handling of PCR cases in general and the Buntin case in particular caused not only personal harm to Buntin, it brought disrespect to the judiciary as a whole and caused the public to lose confidence in our courts." The Masters stated that a "judicial officer has a duty to cooperate with a pending investigation[, which] includes the duty to preserve relevant information and evidence." The Masters found that "[t]his matter is seriously complicated by Judge Hawkins' response to the Commission's investigation, including the information he gave to the Commission, which later proved to be incorrect; the missing order, disk, and letters from the Buntin file; and the lack of any coherent explanation for what happened to the Buntin file and how it somehow appeared on a desk on March 6, 2007." Still, the Masters did "not believe Judge Hawkins intended to deceive the Commission or intended to impede the Commission's investigation." Rather, the Masters faulted Judge Hawkins for failing to correct the misimpressions he and his staff gave to the Commission and for failing to give Buntin, the Commission, and the public an accurate and complete accounting of what happened in the Buntin case, including what exactly caused the almost two-year delay in ruling. The Court concurs with the Masters on these points.

The Masters believed that suspension without pay (for an unspecified period) would be appropriate for Judge Hawkins' misconduct in handling the Buntin PCR case and PCR cases in general. But the Masters expressed further concern regarding Judge Hawkins' response to the Commission's investigation . . . ," and ultimately recommended his removal from office.

The Court agrees that a significant sanction is required but concludes that a period of suspension from office without pay is a significant sanction and the appropriate discipline for Judge Hawkins in this case.

The purpose of judicial discipline is not primarily to punish a judge, but rather to preserve the integrity of and public confidence in the judicial system and, when necessary, safeguard the bench and public from those who are unfit. *See* Matter of Kouros, 816 N.E.2d 21, 31 (Ind. 2004); Cynthia Gray, *A Study of State Judicial Discipline Sanctions*, 3, American Judicature Society (2002) ("Study"). Upon finding judicial misconduct, this Court may impose a variety of sanctions, including removal from office, retirement, suspension, discipline as an attorney, limitations or conditions on the performance of judicial duties, private or public reprimand or censure, fine, assessment of reasonable costs and expenses, or any combination of these sanctions. *See* Adm. Disc. R. 25(IV). Any sanction must be designed to discourage others from engaging in similar misconduct and to assure the public that judicial misconduct will not be condoned. *See* Matter of Lamdin, 948 A.2d 54, 66 (Md. 2008). Removal from office is a drastic measure generally reserved for cases in which the misconduct is flagrant and severe. *See* Matter of Williams, 777 A.2d 323, 330 (N.J. 2001); Study at 4. Removal of an elected judge from office carries with it the additional concern of disrupting the public's choice for service in the judiciary. *See* Matter of Hunter, 823 So.2d 325, 333 (La. 2002); Study at 4.

In Kouros, this Court removed a superior court judge from office for failing to issue orders promptly in criminal cases and for providing inaccurate information regarding her compliance with our orders requiring her to meet certain minimum standards for timely processing of cases. That case began in early 2001, when the Court received a report regarding the respondent's backlog. Two administrative proceedings were initiated to help the respondent correct the problem. The Court eventually suspended the respondent and appointed a judge pro tempore to assume her duties. In December 2003, the Court allowed the respondent to resume her judicial duties based upon her conduct during the suspension and her assurances that she would manage her court effectively in the future.

Meanwhile, on September 26, 2003, the Commission initiated a formal judicial discipline proceeding against her in 78 counts. Evidence showed that after her reinstatement, her office was again in a state of substantial disorder and delays in rulings were again occurring. The Court concluded removal from office was the only sanction that could effectively address this untenable, ongoing situation.

19

> This misconduct was not isolated but included a persistent failure to perform judicial duties over a substantial period. . . . It included certifications to this Court that were not accurate. . . .
>
> Lesser, non-punitive attempts have failed to bring Respondent's judicial performance to an acceptable level. Before outside intervention, Respondent's colleagues on the bench in the Criminal Division spoke with Respondent about ways of improving her efficiency with case processing, including dictation. They also offered to help with Respondent's caseload by allowing the magistrates to do more of the work in Respondent's court and by taking some of her cases. Before initiating this judicial discipline proceeding, the Commission made an informal inquiry that concluded in early 2002 when its counsel wrote to Respondent warning her regarding disorder and the appearance of disorder in her court. In two administrative proceedings . . . we called Respondent's attention to her backlog problem and allowed her an opportunity to correct it. In the second, we even provided Respondent with a detailed set of standards to help eliminate the backlog in her cases and prevent it from recurring. Despite the approximately six-month suspension that we ordered in [the second proceeding], Respondent was unable, once reinstated, to perform in accordance with this Court's directives.
>
> In sum, the facts reflect not only Respondent's failure to manage her caseload in accordance with the minimum standards that we provided, but also an inability even to provide accurate information that would allow us to monitor her performance with confidence to ensure that justice is being administered fairly and promptly in her court.

816 N.E.2d at 30 (citations to record omitted). *See also* <u>Matter of Washington</u>, 800 N.E.2d 348 (N.Y. 2003) (judge removed from office for maintaining persistent case backlog despite repeated remedial efforts to help her, and for submitting late, incomplete, and false quarterly reports); <u>Hunter</u>, 823 So.2d 325 (judge removed from office for persistent failures to produce timely and accurate transcripts in criminal cases and refusal to cooperate with appellate court in securing record transcripts for appellate review).

In <u>Kouros</u>, we removed the respondent from office after she proved unable to respond to repeated remedial steps to bring her into compliance with her duties. By contrast, Judge Hawkins has not compiled a similar record of repeat offenses and the Masters found Judge Hawkins has taken effective measure to correct the management issues that have given rise to the issues noted herein.

In Matter of Newman, 858 N.E.2d 632 (Ind. 2006), the respondent's revocation of a criminal defendant's probation was reversed on appeal. Although the respondent told his court reporter to arrange the defendant's release, he did not specifically instruct her to prepare an order. Although an entry on the CCS directed that the defendant be released, the entry was not sent to the Department of Correction. As a result, the defendant unnecessarily spent over one year incarcerated and one year on supervised parole. Neither an inquiry by the defendant's parole officer nor receipt of a tort claim notice from the defendant prompted the respondent to take corrective action. The Commission and the respondent jointly tendered a "Statement of Circumstances and Conditional Agreement for Discipline" stipulating to certain facts, agreeing that the respondent violated certain Canons of Judicial Conduct, and requesting the imposition of a public reprimand as appropriate discipline. In approving the agreement, the Court stated:

> Respondent's conduct reflects discredit on him and the Indiana judicial system. It goes without saying that a trial court judge is duty-bound to carry out the orders of a reviewing appellate tribunal. That duty is at its highest when an appellate remand order affects the substantial rights and interests of a party under the trial court's control. When a trial court judge fails in this duty, the appellate relief secured by the party evaporates. [The defendant] can never regain the time and freedom that the Court of Appeals' opinion granted him.
>
> A public reprimand is a blemish on a sitting judge's reputation, adversely affecting the public's evaluation of the judge's performance in office. It is not the severest sanction we could impose, and we would have been inclined to impose a harsher penalty had there not been an agreement with the Commission. Because Respondent has (albeit belatedly) accepted responsibility for his actions, has apologized to [the defendant] and his family specifically and to the judicial community generally, and has agreed to accept, with the Commission's consent, a public censure in lieu of a further proceedings, we accept the parties' Conditional Agreement for Discipline.

Id. at 635.

One of a judge's most critical responsibilities is to oversee his or her court's operation so all litigants are afforded their rights. *See* Matter of Lockwood, 804 P.2d 738, 743 (Az. 1990). As in Newman, Judge Hawkins' failure to exercise effective supervision of his staff (including Commissioner Broyles) led to a person's unnecessarily prolonged incarceration. In contrast to Newman, however, Judge Hawkins' management problems were systemic rather than an isolated

incident, and his case is compounded by his multiple missteps in responding to the Commission's investigation.

Judge Hawkins' misconduct lies somewhere on the continuum between the misconduct in Newman and the misconduct in Kouros. Other courts have imposed suspensions from office without pay on judges for similar misconduct. *See, e.g.*, Matter of Clark, 866 So.2d 782 (La. 2004) (30-day suspension; judge failed to fulfill earlier promise to correct problems but had since taken steps to cure decision delay and reporting problems); Matter of Van Sharp, 856 So.2d 1213 (La. 2003) (agreed 60-day suspension; judge was already on disciplinary probation and had not improved in rendering timely decisions); Matter of Waddick, 605 N.W.2d 861 (Wis. 2000) (six-month suspension; judge had recurring delays over seven years and falsely certified that no cases were pending longer than prescribed period). Further, the person with primary culpability in this matter was Commissioner Broyles. As a duly appointed master commissioner, she was charged with carrying out various judicial functions. *See* Ind. Code §§ 33-33-49-16(e); 33-23-5-5 through -9. Judge Hawkins relied on Commissioner Broyles to his detriment, trusting her to perform duties she failed to perform.

A suspension from office without pay, regardless of duration, is not a minor sanction. Even more than a public reprimand, any such suspension is a significant blemish on a sitting judge's reputation.

## Conclusion

In the current case, a majority of this Court concludes that the appropriate discipline lies between a public reprimand and removal from office, i.e., a period of suspension from office without pay. However, the justices of this Court hold divergent views regarding the appropriate duration of such suspension for Judge Hawkins, as more fully expressed in the attached separate opinions. Because a majority of the Court favors a suspension without pay for a period of at least sixty (60) days, that is the effective disposition reached today in this matter.

**Disposition:** On the basis of the foregoing and the views expressed below, the Court orders that the Respondent, Grant W. Hawkins, shall be suspended from the office of Judge in the Marion Superior Court without pay for sixty (60) days commencing the first day following the date of this opinion. The suspension shall terminate and the judge shall automatically be reinstated to office at 12:01 A.M. on the sixty-first day following the date of this opinion. The costs of this proceeding are assessed against, and accordingly should be equally shared by, Respondents. The Special Masters appointed in this case are discharged, and we thank them for their conscientious service in this matter.

**Dickson, Justice, concurring**.

       With great appreciation for the careful, thorough, and forthright evaluation and recommendations of the Masters, and with high regard for my colleagues' thoughtful although divergent views, I conclude that appropriate judicial discipline given the facts and circumstances of this case is a suspension without pay for sixty (60) days, recognizing in part that Judge Hawkins has already been subject to a suspension from office (with pay, as required by Indiana Admission and Discipline Rule 25(V)(B)), in excess of 105 days.

**Shepard, Chief Justice, dissenting.**

       A suspension of sixty days without pay is not an adequate sanction for a judge whose disorganization and indifference caused a man wrongly to sit in prison for two years.

       Three of Indiana's finest trial judges have done an exceptionally hard thing by sitting in judgment of a colleague's actions, and they have given chapter and verse about the citizens (including both defendants and defendants' families, and the victims and their families) whose dearest interests suffered from Judge Hawkins' disorganization and disregard.  This is not a story about an isolated error of omission, of which any of us can be guilty from time to time.  Rather, the evidence reflects a series of failures under circumstances that afforded many reminders and alerts.  These did not avail because Judge Hawkins' office was a place where family phone calls went unheeded and letters went to the wastebasket.

       Moreover, the Masters have laid bare how Judge Hawkins responded once the judiciary's disciplinary body forced the Judge and his Commissioner and their staff to confront the fact that a grave failure had occurred on their watch.  The combination of collective dissembling and business-as-usual under circumstances that would put most of us on the highest alert led them to say:

> The Masters have reluctantly come to the conclusion that the
> failure to correct the misrepresentations promptly and the failure to
> offer an accurate and complete accounting of what happened in the

24

Buntin case is the same as Judge Hawkins' deliberately setting out to deceive the Commission and the public.

The question dividing the members of this Court is whether Judge Hawkins may be presented to the public as someone who can be relied on to take better care of litigants going forward. His approach to defending the present charges helps answer that question and the answer is not comforting. Beyond all the actions that so shocked the trial judges hearing the witnesses, Judge Hawkins has chosen to argue to us that Mr. Buntin isn't necessarily innocent. Suggesting that perhaps there wasn't much injustice in Buntin's two-year wait in prison for a ruling is not the sort of defense one ought to hear from a judicial officer, but it complements Judge Hawkins' proposal that the appropriate sanction might be time off with pay. I associate myself with Justice Sullivan's assessment of the appropriate sanction.

**Sullivan, Justice, dissenting.**

The Court's opinion details Judge Grant Hawkins's misconduct and I concur with the Court's findings except that I agree with the Masters that the Commission proved the allegations in Counts V through VIII by clear and convincing evidence. Balancing mitigating circumstances against the weight of the misconduct, I believe that Judge Hawkins should be suspended from office for one year.

I believe a more severe sanction than a 60 day suspension is warranted by four aspects of this case.

First, the facts of this case make clear (including this Court's listing of seven other post-conviction cases with delayed rulings) that Judge Hawkins did not organize and manage the court and its staff in a way that assured prompt and conscientious attention to claims of improper incarceration. This is a matter of grave concern in Criminal Division 5, where the men and women charged, tried, convicted, and sentenced, including those who subsequently seek post-conviction relief, are often individuals with the most significant of liberty interests at stake.

Second, Judge Hawkins did not give Mr. Buntin's case the prompt and conscientious attention that it deserved, even when it became the subject of an allegation of judicial misconduct. The Commission's counsel called Judge Hawkins about the matter in early March; Judge Hawkins did not grant Buntin relief until April 20. Sometimes the wheels of justice turn slowly for good reasons. But here the delay was entirely attributable to Judge Hawkins not giving the matter adequate attention. Even after the Buntin order was finally issued on March 8, it took additional prompting by Buntin's family for Judge Hawkins to cause the order to be entered into the CCS (on March 27) and to schedule a hearing on supplementary orders as to retrial or discharge (held April 20).

Third, Judge Hawkins's failure to report to the Commission when the Buntin file had been located and an order had been issued, his misrepresentation about archiving the file, his failure to secure evidence of the unprocessed order, and his misrepresentation about the "post-it note," seriously complicated the Commission's investigation and constituted additional misconduct in its own right. Contrary to the view of the Court, I agree with the Masters that these charges were proven, adding only that most of them require credibility determinations that the Masters were in a better position to make than we.

Lastly, I am influenced by the unanimous conclusion of our Masters, each a seasoned veteran of the trial bench with extensive experience in criminal and post-conviction matters, when they recommend that Judge Hawkins removal from office:

> We reach these conclusions with great regret and after much thought and do not make this recommendation lightly. . . . The Masters believe, however, the mistakes made in this case were so critical, the loss of liberty so significant, and the Judge's response so lacking, that we as trial judges would not carry out our duty as Masters unless we called for a significant sanction.

My analysis of Judge Hawkins's misconduct, standing alone, is that it warrants a two year suspension from office. He did not organize or manage his court to assure prompt and conscientious attention to the liberty interests of incarcerated persons in general or to Mr. Buntin in particular. He impeded the Commission's investigation of his case and it is the considered judgment of the Masters that he be removed from office.

26

But, in my view, Judge Hawkins's misconduct does not stand alone. His sanction should be mitigated by his years of exemplary service to the bench and bar of this State.

Balancing the mitigating circumstances against the weight of the misconduct itself, I would suspend Judge Hawkins from office for one year.

**Boehm, Justice, dissenting.**

In my view the degree of sanction appropriate for a judge depends on both the degree of culpability and the judge's fitness for ongoing service. I believe that this record establishes that Judge Hawkins is guilty of nothing more than excessive reliance on others and failure to have good procedures to control the flow of cases. The consequences of these oversights in Mr. Buntin's case are severe, but the issues before us today are Judge Hawkins's personal culpability and his fitness for ongoing service. The shortcomings in office procedures have been largely addressed for the future. In my view a significant sanction is warranted for a complete breakdown in proper controls over this case and apparently others. But Judge Hawkins has already been suspended with pay for over three months. Any suspension with or without pay is a sanction that most judges would regard as substantial. And a suspension without pay for more than a few weeks in most cases will be tantamount to a forced resignation.

I hold the panel that heard this case in very high regard, but respectfully disagree with them and the majority of this court as to the degree of sanction that is appropriate here. Judge Hawkins committed no act of intentional wrongdoing, had no selfish motive, and showed no intentional disregard of the Code of Judicial Conduct. In my view a thirty day suspension is a very substantial sanction and the most that these facts warrant. I nonetheless agree that a suspension of sixty days is the proper disposition of this case, given that a majority favors a suspension for that period or longer.

Rucker, J., concurs.