


FILED

Mar 14 2018, 2:36 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 05S00-1706-JD-430

## In the Matter of the Honorable Dean A. Young, Judge of the Blackford Circuit Court,

*Respondent.*

---

Decided: March 14, 2018

Judicial Discipline Action

Hon. Judith Stewart,
Hon. Earl G. Penrod, Senior Judge, and
Hon. Matthew C. Kincaid,
Special Masters.

---

**Per Curiam Opinion**

Chief Justice Rush, Justice David, Justice Massa, and Justice Slaughter concur.
Justice Goff did not participate.

**Per Curiam.**

We find that Respondent, the Honorable Dean A. Young, Judge of the Blackford Circuit Court, engaged in judicial misconduct relating to a temporary restraining order that he heard and issued without adequate notice to the responding party or witnesses, and while he had a specific interest in the subject matter. The Special Masters recommended, and the parties agree, that the appropriate discipline is to suspend Judge Young for six days without pay.

This matter is before us on the report of the Special Masters we appointed to hear evidence on the Indiana Commission on Judicial Qualifications' ("Commission's") "Notice of the Institution of Formal Proceedings and Statement of Charges" against Judge Young, and on the parties' joint response to the report. We have original jurisdiction under Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25.

# Background Facts[1]

This case arose in 2015 from a disagreeable relationship between Derinda Shady, who was the elected Blackford County Clerk, and the County's two judges: Circuit Court Judge Young and Superior Court Judge John Barry. The tension culminated in the two Judges holding a restraining-order hearing at which Shady was not present, then issuing a restraining order barring her from the courthouse until the order was vacated six days later.

On August 3, 2015, the Blackford County Council announced its intent to cut funding for two positions in the Blackford County Clerk's office. That announcement upset Shady, who did not think her office could do its work with only the two employees who would remain.

Shady asked Judge Young to intervene with the County Council, but he and Judge Barry declined and instead transferred open criminal-court files

---

[1] As discussed below, we accept the parties' agreement with the Masters' proposed findings of fact, conclusions of law, and recommended sanction. We therefore recite the facts consistent with the Masters' findings.

to their own offices in an effort to lighten the Clerk's workload. Those decisions angered Shady—she told Judge Young, "You can collect your own court costs, too," and she told Judge Barry that he'd "better bring a cop" if he came to retrieve the files. She apologized a few days later and let the files be transferred without incident. But she also continued referring to the Judges by obscene names in front of office staff and the public. (The Judges knew secondhand of her insolence but took no action.)

On August 19, the County Council held a public hearing for budget appeals. Shady attended to appeal the defunding decision, and the Judges attended the meeting for her part of the discussion before going back to Judge Young's home. The Council rejected Shady's staffing appeal, and Shady was rude to Council members afterward—but she made no specific threat not to do her job or to destroy court records. Judge Barry received reports about Shady's rude behavior and told Judge Young about them, but Judge Young did not see Shady's behavior firsthand.

The next morning, August 20, Judge Young arrived at the courthouse at about 7:30 and began making phone calls, including to one of the Council members, asking about Shady's behavior the previous evening. He then met with Judge Barry and suggested that they "would have a hearing and 'lock [Shady] out of her office'" if her behavior did not change.

By 8:00 that morning, Judge Young went to the Clerk's Office to demand that Shady come upstairs to meet with him and Judge Barry. Shady was on the phone at the time, but after her call, she phoned Judge Young and told him "if he had something to say that he could come down to her office." Judge Young replied, "Get up here! Now!" Shady came upstairs and brought her daughter, Deputy Clerk Patricia Milholland. But Judge Young was unwilling to have Milholland present. At a stalemate, Shady and Milholland went back downstairs after a few minutes, and no meeting happened that day.

The Special Masters found that Judge Young probably told Shady that they would hold a hearing about her conduct if she refused to talk to them—but probably not that they would hold the hearing a matter of minutes later, or that the issue would involve contempt of court or enjoining her from entering the Courthouse.

Unbeknownst to Judge Young, Shady went home upset after the abortive "meeting" and went to the hospital with a panic attack later that morning. Sometime after Shady left, Judge Young sent a Sheriff's Deputy to bring Shady, Milholland, and another Deputy Clerk upstairs to court. The Special Masters found that neither Deputy Clerk probably knew why they were being brought into court, even though Judge Young was probably considering enjoining them from the building, too. (Findings 17–19)

Beginning at 8:25 a.m., Judges Young and Barry *sua sponte* began a hearing to enjoin Shady from the Courthouse. There was no written application, affidavit, or verified complaint. Shady had no written notice of the date and time of the hearing or its subject, nor did the Deputy Clerks who were present have prior written notice of the allegations against them before Judge Young questioned them.

At the hearing, with no personal knowledge of the reasons for Shady's absence, Judge Young stated that she had "stormed out" and "fled the courthouse grounds." He also stated that the Sheriff was "unable to secure her attendance," even though there had been no further efforts in that regard—and even though Shady's daughter Milholland was present. Judge Young also made comments evincing bias against Shady—including that she was "totally poisoning this workplace" and that if she'd made her "bring a cop" comment to him instead of Judge Barry, "she would be here in hunter orange this morning, in chains, where she would stay and enjoy her Thanksgiving dinner, probably her Christmas dinner as well."

Judge Young then declared an "emergency" that "the Clerk is unfit to assume her duties," and that she would be "locked out of the entire courthouse square." He further announced that Shady "will be arrested" if she appeared at the courthouse before the next hearing, which he set for August 26, six days later—even though there had been no evidence or allegations that Shady had threatened to sabotage the Court's files.

Only after making those statements (and letting Judge Barry make brief remarks) did Judge Young begin questioning the Deputy Clerks who were present. The Special Masters listened to a recording of the hearing and specifically found that Judge Young's tone did not "reflect anger or upset"—but they also found that his questioning was like "an investigator

rather than a neutral and impartial arbiter" and that the Deputy Clerks were probably intimidated and upset by the questioning.

By 1:30 the same afternoon, Judges Young and Barry issued a temporary restraining order ("the TRO") of Judge Young's drafting, barring Shady from the courthouse grounds until a hearing set for August 26 at 11:00 a.m. The TRO stated in part that "evidence indicates that [Shady] will refuse to obey the lawful commands of the Courts regarding Court business" and "refuse or sabotage" the Superior Court's business. Even though Judge Young was the requestor of the TRO, he presided over the hearing and did not disqualify or request appointment of a special judge.

On the morning of August 25, Shady's attorney called Judges Young and Barry on the phone, seeking a continuance of the next day's hearing and pointing out "that the case was in an odd posture because the judges were both parties and presiding over the case." At that point, the Judges sought advice from counsel for the Commission, who recommended that the judges "deescalate the situation and work towards a settlement." By that afternoon, the TRO was dissolved.

## Discussion

A judicial officer may be disciplined for, among other things, conduct prejudicial to the administration of justice and violation of the Code of Judicial Conduct. Ind. Admission and Discipline Rule 25(III)(A). The Commission bears the burden of proving judicial misconduct by clear and convincing evidence. Admis. Disc. R. 25(VIII)(K)(6).

Even though the parties have asked us to adopt the Masters' findings and conclusions, we are not bound by their agreement. Rather, we review the Masters' report de novo—specifically retaining "discretion to adopt or reject all or part of the proposed findings of fact, conclusions of law, or recommended disposition with or without objection by a party." Admis. Disc. R. 25(VIII)(P)(3). But even though our review is de novo, we recognize that the Masters are best positioned to assess witness demeanor and judge the credibility of conflicting testimony. *In re Danikolas*, 838 N.E.2d 422, 428 (Ind. 2005). We therefore give their findings special weight, especially when, as here, their findings are unanimous. *Id.*

Our review of the record shows ample support for the Masters' findings, and we find it significant that the parties, after a contested hearing, concur with those findings. We therefore accept the Masters' findings, consistent with the parties' agreement.

In turn, the Masters concluded that the Commission had proved all charged violations of the Indiana Code of Judicial Conduct by clear and convincing evidence:

- Count 1 charged that, by enjoining Shady from the courthouse after a hearing at which she was not present and of which she had not been adequately notified, Judge Young violated Rules 1.1[2], 1.2[3], 2.2[4], 2.6[5], and 2.9(A)[6].
- Count 2 charged that Judge Young's conduct prior to and during the August 20 hearing did not reflect patience, dignity, or courtesy and did not promote public confidence in judicial impartiality, in violation of Rules 1.2 and 2.8(B)[7].
- Count 3 charged that commanding the two Deputy Clerks to appear for a hearing without prior written notice of its purpose violated Rules 1.1, 1.2, and 2.2.
- Count 4 charged that presiding over the TRO hearing, when he had a specific interest in the subject matter, would lead a reasonable

---

[2] "A judge shall comply with the law, including the Code of Judicial Conduct." Ind. Judicial Conduct Rule 1.1.

[3] "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Jud. Cond. R. 1.2.

[4] "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Jud. Cond. R. 2.2.

[5] "A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." Jud. Cond. R. 2.6(A).

[6] Subject to exceptions not applicable here, "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter." Jud. Cond. R. 2.9(A).

[7] In relevant part, "[a] judge shall be patient, dignified, and courteous to litigants, . . . , witnesses, . . . , court staff, court officials, and others with whom the judge deals in an official capacity . . . ." Jud. Cond. R. 2.8(B).

person to question Judge Young's impartiality in the matter, violating Rules 1.1, 1.2, 2.2, and 2.11[8].

We agree and adopt those conclusions.

As to sanction, the Masters suggest several aggravating and mitigating factors. In aggravation, they found that Judge Young's misconduct occurred in his judicial capacity; that he lacks insight into the wrongfulness of his conduct; that Shady and the two Deputy Clerks suffered actual harm because Shady "was publicly humiliated by the TRO" and the deputies were "placed in fear of sanction"; and that his misconduct "demonstrated partiality in the handling of this controversy which undermines the perception of his impartiality generally." But they also noted several factors in mitigation:

- Judge Young's "lengthy career in the law and public service" and reputation as "reasonable and cooperative" during his time in the Indiana Legislature;
- his "reputation for honesty";
- he "mitigate[d] the harm" of his misconduct and "change[d] course" by calling counsel to the Commission and following her advice to promptly settle the matter;
- his conduct, while "perhaps indicative of hubris, was not motivated by a desire for financial, personal or material gain"; and
- he "was confronted by a difficult situation created by the Clerk's behavior."

Weighing those factors, the Masters recommended that Judge Young should be suspended without pay for six days, "consistent with the six days the TRO was in place." The parties have agreed to that sanction, and they further agree that costs of these proceedings should be assessed against Judge Young.

"The purpose of judicial discipline is not primarily to punish a judge, but rather to preserve the integrity of and public confidence in the judicial

---

[8] In relevant part, "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned," including when the judge "has . . . personal knowledge of facts that are in dispute in the proceeding" or "was a material witness concerning the matter." Jud. Cond. R. 2.11(A)(1), 2.11(A)(6)(c).

system and, when necessary, safeguard the bench and public from those who are unfit." *In re Hawkins*, 902 N.E.2d 231, 244 (Ind. 2009). The sanction must be designed to deter similar misconduct and assure the public that judicial misconduct will not be condoned. *Id*. And as we have noted, any "suspension from office without pay, regardless of duration, is . . . a significant blemish on a sitting judge's reputation"—more so than a public reprimand. *Id*. at 246. In view of those principles, we agree that six days' suspension without pay and assessment of the costs of these proceedings is an appropriate sanction.

# Conclusion

The Court orders that the Respondent, Dean A. Young, shall be suspended from the office of Judge in the Blackford Circuit Court without pay for six (6) days commencing at 12:01 A.M. on Monday, March 19, 2018. The suspension shall terminate and the judge shall automatically be reinstated to office at 12:01 A.M. on Sunday, March 25, 2018. The costs of this proceeding are assessed against Respondent. The Special Masters appointed in this case are discharged, and the Court commends them for their conscientious service in this matter.

Rush, C.J., and David, Massa, and Slaughter, JJ., concur.
Goff, J., did not participate.

ATTORNEYS FOR RESPONDENT

Scott E. Shockley
James R. Williams
Muncie, Indiana

ATTORNEYS FOR INDIANA COMMISSION ON JUDICIAL QUALIFICATIONS

Seth Pruden, Counsel to the Commission
Marcus McGhee, Staff Attorney to the Commission
Indianapolis, Indiana